IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| FRANCISCO ZEPEDA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:22-cv-01386-RJD |
| | ) | |
| | ) | |
| LORI CUNNINGHAM, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

**DALY, Magistrate Judge:**[1]

Plaintiff Francisco Zepeda, an inmate of the Illinois Department of Corrections ("IDOC") who is currently incarcerated at Centralia Correctional Center, brought this action pursuant to 42 U.S.C. § 1983 for deprivations of his constitutional rights while he was at Lawrence Correctional Center. (Doc. 1). Zepeda alleged that several defendants were deliberately indifferent to his sleep apnea in violation of the Eighth Amendment. After threshold review of the Complaint, Zepeda was allowed to proceed on an Eighth Amendment deliberate indifference claim against Lori Cunningham, Lynn Pittman, Vipin Shah, M.D., Sara Stover, NP, and Carissa Luking, NP for delaying Zepeda's sleep study and access to a CPAP machine. (Doc. 13, p. 3). Defendant Stover was thereafter dismissed without prejudice for Zepeda's failure to exhaust available administrative remedies against her before initiating this action. (Doc. 68). After being assigned counsel, Zepeda

[1] This matter has been assigned to the undersigned to conduct all proceedings through the parties' consent pursuant to 28 U.S.C § 636(c) and Federal Rule of Civil Procedure 73. (Doc. 34).

filed an Amended Complaint and was allowed to proceed on an Eighth Amendment deliberate indifference claim against Defendants Cunningham, Shah, and Luking. (Doc. 102).[2]

This matter comes before the Court on Defendants' Motions for Summary Judgment (Docs. 123 & 126). Zepeda responded to both motions (Docs. 147, 148, 149 & 150), and Defendants replied (Docs. 151, 152 & 156). Defendants Shah and Luking also moved to substitute their response to Zepeda's statement of additional material facts. (Doc. 162). For the reasons explained below, the Motion to Substitute (Doc. 162) is **GRANTED**, and the Motions for Summary Judgment (Docs. 123 & 126) are **DENIED**.

## Factual Background[3]

In 2007 or 2008, Zepeda was diagnosed with sleep apnea, and shortly thereafter he began using a CPAP machine to treat the condition. (Doc. 147, ¶ 1). Between August 16, 2018, and July 2021, Zepeda was incarcerated at Lawrence. (Doc. 124, ¶ 1). Dr. Shah was employed by Wexford Health Sources, Inc. ("Wexford") as a physician and worked at Lawrence on an as-needed basis from 2018 to 2021. (*Id.* at ¶ 2). NP Luking was employed by Wexford as a nurse practitioner and worked at Lawrence part-time in 2019, then left her position for a time, and returned full-time from 2021 to 2025. (*Id.* at ¶ 3). Lorie Cunningham is the Health Care Unit Administrator ("HCUA") at Lawrence. (Doc. 150, ¶ 1).

On August 16, 2018, Zepeda transferred from the Northern Reception Center ("NRC") to Lawrence. (Doc. 147, ¶ 4). In the transfer summary from NRC, under chronic conditions, the nurse

[2] The Court dismissed without prejudice Count 2 of the Proposed Amended Complaint asserting a claim under the Americans with Disabilities Act ("ADA") because it was improperly brought against individual defendants instead of a public entity. (Doc. 102, p. 6).

[3] This is based on the parties' statements of material facts viewed in the light most favorable to Zepeda.

listed sleep apnea, and under "follow-up care," wrote "MD f/u sleep apnea." (*Id.* at ¶ 4). On August 17, 2018, an intake nurse placed Zepeda in the chronic clinic for hypertension and noted "CHF [congestive heart failure], sleep apnea," and "1 wk F/u ROI sleep study." (*Id.* at ¶ 5). According to HCUA Cunningham, that means a follow-up in one week about whether there was a sleep study appointment; Cunningham would expect that follow-up to actually take place in a week. (*Id.* at ¶¶ 27-28). Zepeda testified that on every following visit he had with a medical provider at Lawrence, he mentioned his sleep apnea and asked for a CPAP machine. (Doc. 147, ¶ 3).

On August 27, 2018, Zepeda saw Dr. Shah in the Hypertension Chronic Clinic ("HCC") for an initial evaluation to discuss chronic conditions. (Doc. 124, ¶¶ 7-8). Zepeda discussed his history of hypertension and past medical history. (*Id.*). Dr. Shah reviewed Zepeda's vitals, which were all within normal limits, and determined that his hypertension was well controlled and he was in stable condition.[4] (*Id.*). Dr. Shah continued the same cardiac medications and ordered a follow-up in a month and blood work. (*Id.*). He also provided Zepeda with patient education, including risk reduction, notifying the Health Care Unit ("HCU") of any angina (chest pain), medication compliance and side effects, and the long-term importance of follow-up. (*Id.* at ¶ 9).

According to Dr. Shah, if he had discussed sleep apnea or any related complaints with Zepeda on that visit, he would have documented that in his progress notes, as is his custom and practice. (Doc. 124, ¶ 9). Because his medical note did not reference sleep apnea, he testified he did not discuss it with Zepeda. (*Id.*) Zepeda, however, disputes that assertion. According to his deposition, he told Dr. Shah at that visit that he had sleep apnea, to which Dr. Shah responded: "in

[4] According to the cited medical record, Zepeda's blood pressure at that visit was 131/84. (Doc. 152, ¶ 8, 124-4, p. 142). Zepeda disputes that his blood pressure was "well controlled" at that time. (Doc. 148, ¶ 9).

order to get a CPAP machine, you would have to have your family send the CPAP machine in." (Doc. 147, ¶ 21-22). Zepeda insisted that IDOC needed to provide him with a CPAP machine, but Dr. Shah responded: "What did you do so bad that your family won't help you?" (*Id.*).

On September 27, 2018, the previously dismissed Defendant NP Stover saw Zepeda in the HCC. She prescribed Aspirin, Hydralazine (vasodilator), Losartan (antihypertensive), Diltiazem CD (calcium channel blocker and antihypertensive drug), and Coreg (beta blocker), and ordered bilateral knee-high TED hose and a one-month follow-up for his blood pressure. (*Id.* at ¶ 12). She did not document any self-reports of sleep apnea or trouble sleeping, but Zepeda, again, disputes that allegation, pointing to his testimony that he asked for a CPAP machine at every visit with a medical provider, including nurse practitioners. (*Id.*).[5]

On November 16, 2018, Zepeda saw NP Stover with complaints of dizziness and hypertension. (*Id.* at 13). His blood pressure was high, so NP Stover ordered Clonidine and to recheck his blood pressure in one hour. (*Id.*). An hour later, his blood pressure had lowered; NP Stover gave him a no-work order and low-bunk permit for two weeks and ordered a one-week follow-up and knee-high TED hose. (*Id.*). She did not document any self-reports of sleep apnea or trouble sleeping, but Zepeda again testified he asked for a CPAP machine at every medical visit.

On November 27, 2018, Zepeda saw Dr. Shah for a follow-up for his hypertension. (*Id.* at 14). Dr. Shah adjusted Zepeda's blood pressure medications as his blood pressure reading was still

[5] Zepeda challenges the admissibility of the medical records attached to Defendants' Memorandum in Support of their Motion for Summary Judgment for being handwritten, partly illegible, and containing jargon and shorthand, without testimony or an affidavit to explain it. Because the Court finds that even considering this evidence as presented in Defendants' motions, Defendants are not entitled to summary judgment, there is no need to address this evidentiary challenge at this time.

high and ordered blood pressure checks three times a week for one month. (*Id.*). He also ordered a one-month follow-up. Dr. Shah did not document in this note any self-reports of sleep apnea or trouble sleeping, but Zepeda argues that he asked for a CPAP machine at every medical visit. (*Id.*).

On December 11, 2018, NP Stover noted that Zepeda was scheduled on her call line for increased blood pressure and a request for an audioscope, but Zepeda refused his call pass. (Doc. 148, ¶ 16). Zepeda, however, denies refusing the call pass and accuses the correctional officers of not allowing him to attend the visit. (*Id.*). On December 26, 2018, Zepeda saw Dr. Shah for high blood pressure. Dr. Shah increased his Clonidine dosage to treat the elevated blood pressure. (*Id.* at ¶ 17). Additionally, he instructed Zepeda on lifestyle modifications. Dr. Shah requested that staff obtain Zepeda's prior sleep apnea records. (*Id.*). Zepeda did not recall Dr. Shah requesting his sleep apnea records but recalled signing several waivers to get the medical information. (*Id.* at ¶ 18). According to Cunningham, if a provider ordered an inmate's pre-incarceration medical records, the Medical Records Department would be responsible for requesting them. (*Id.* at ¶ 19).

On March 7, 2019, Zepeda saw previously dismissed Defendant Dr. Pittman for complaints of constipation and elevated blood pressure. (Doc. 148, ¶ 20). Dr. Pittman adjusted Zepeda's blood pressure medications and prescribed him stool softeners. (*Id.*). She did not document any self-reported complaints of sleep apnea or trouble sleeping, but Zepeda again counters that he asked for a CPAP machine at every encounter with a medical provider. (*Id.*). On March 14, 2019, Dr. Pittman evaluated Zepeda in the HCC. (Doc. 148, ¶ 21). His blood pressure was elevated, but Dr. Pittman noted that Zepeda missed his Clonidine dose the night before. She ordered blood work and that his blood pressure be rechecked in the morning and gave Zepeda a low bunk permit for dizziness/nocturia (frequent urination at night). (*Id.*). In addition to the HCC note, Dr. Pittman also

completed a progress note stating that Zepeda's hypertension was not controlled but was improving, and that his headaches and dizziness were also improving. Dr. Pittman ordered a one-week follow-up for a blood pressure check. (*Id.*). She did not document any self-reported complaints of sleep apnea or trouble sleeping. (*Id.*). On March 22, 2019, a nurse noted that Zepeda refused his call pass for the MD call line. (*Id.* at ¶ 22).

On June 18, 2019, NP Stover renewed the Clonidine prescription. (Doc. 148, ¶ 23). On August 15, 2019, she saw Zepeda for complaints of ear pain and constipation, and prescribed him medication for those symptoms. (*Id.* at ¶ 24). She noted that they discussed his hypertension and his medication compliance but did not document any sleep apnea complaints. (*Id.*).

On October 1, 2019, NP Luking documented that Zepeda was referred to audiology based on his audioscope testing. (Doc. 148, ¶ 25). She ordered that all hearing accommodations be on hold until he is evaluated by the outside facility. (*Id.*). On October 28, 2019, Zepeda saw NP Luking in the HCC, and she documented that he had a history of sleep apnea. (*Id.* at ¶ 26). She referred him to the cardiologist because he had a strong history of hypertension that was not controlled with several classes of medications. NP Luking did not document any self-reported complaints of sleep apnea or trouble sleeping. (*Id.*). She testified that it was her custom and practice to document all self-reported complaints made by a patient. (*Id.*). She confirmed that if she did not document that Zepeda self-reported sleep apnea to her, that means that they did not discuss it at that encounter. (*Id.*). Zepeda disputes this allegation, pointing to his testimony that he requested a CPAP machine at every encounter he had with a medical provider.

On October 30, 2019, Dr. Pittman noted that Collegial Review recommended she speak with Dr. Garcia to discuss Zepeda's hypertension management. (Doc. 148, ¶ 27). On November 8,

2019, Zepeda saw Dr. Pittman with complaints of high blood pressure since his Valsartan medication was switched to Losartan. Dr. Pittman noted that she spoke with Dr. Garcia and prescribed several cardiac medications at Dr. Garcia's recommendation. Dr. Pittman did not document any self-reported complaints of sleep apnea or trouble sleeping. (*Id.* at ¶ 28).

On November 13, 2019, Dr. Pittman noted that Zepeda was there for a blood pressure check, but there was no need for an appointment that day. (*Id.* at ¶ 29). She ordered that Zepeda's medications be given to him as Direct Observation Therapy ("DOT") to screen medication compliance versus blood pressure control. Dr. Pittman ordered a 4-week follow-up. (*Id.*).

On December 3, 2019, Dr. Pittman noted that Zepeda was there for a blood pressure check and his readings were elevated for the past four weeks. (Doc. 148, ¶ 30). Dr. Pittman increased Zepeda's Clonidine medication and ordered to continue blood pressure checks. (*Id.*). On December 5, 2019, she renewed Zepeda's cardiac medications for one year. (*Id.* at ¶ 31). On December 10, 2019, Dr. Pittman saw Zepeda, who reported he was feeling better while on Imdur. (Doc. 148, ¶ 32). Her assessment was that his hypertension was improving with medication titration. (*Id.*). She prescribed Imdur for six months and allowed Zepeda to keep his medications on him. (*Id.*). Dr. Pittman did not document any complaints of sleep apnea, but Zepeda again points to his testimony that he asked for a CPAP machine at every encounter he had with a medical provider. (*Id.*).

On January 29, 2020, Zepeda saw Dr. Pittman and reported that he was not sleeping well without his CPAP machine, which he last used at home two years earlier. (*Id.* at ¶ 33). Dr. Pittman referred Zepeda for an onsite sleep study after completing the Epworth Sleepiness Scale survey, which showed that Zepeda was "excessively sleepy." (*Id.*). Dr. Pittman increased Zepeda's Imdur

prescription and ordered weekly blood pressure checks for two months. (*Id.*). On February 5, 2020, the sleep study referral was approved. (*Id.* at ¶ 34).

On April 3, 2020, the IDOC issued a memorandum stating, "We are, therefore, calling for the immediate suspension [of] the use of CPAP in all patients who have been isolated or tested for Covid, or are known [C]ovid positive patients, either symptomatic or asymptomatic. For all other patients with chronic sleep apnea that are no[t] in the above category, CPAP might be continued if, and only if, we provide safe close monitoring in a single cell." (Doc. 150, ¶ 37). On April 21, 2020, the IDOC issued another Covid-19 policy indicating that individuals may utilize CPAP machines if they were in an isolated area in a single cell and "full PPE had to be used with security and health care when the patient was using it." (*Id.* at ¶ 38). On April 29, 2020, NP Luking performed a chart review and renewed Zepeda's low bunk permit for one year. (Doc. 148, ¶ 35). On June 22, 2020, she saw Zepeda for complaints of ear pain and prescribed ear drops, but did not document any self-reported complaints of sleep apnea or issues sleeping. (*Id.* at ¶ 37).

On June 25, 2020, Zepeda was evaluated by an offsite audiologist who diagnosed Zepeda with mild to moderate sensorineural hearing loss and recommended an ENT consultation regarding right ear pain and dizziness. (Doc. 148, ¶ 38). On June 29, 2020, NP Luking saw Zepeda after he returned from his offsite audiology evaluation. (*Id.* at ¶ 39). She noted that Zepeda was asking about his sleep study. (*Id.* at ¶ 40). NP Luking noted in the plan section, "Sleep study referral form not checked." (*Id.*). According to Cunningham, that note meant that the referral had not yet been scheduled. (Doc. 156, ¶ 32). That day, NP Luking referred Zepeda to the ENT and wrote Zepeda a permit for waist chains for one year. (Doc. 148, ¶ 40).

On July 15, 2020, Zepeda saw Dr. Pittman, who noted that Zepeda was approved for the onsite sleep study in February 2020 and ordered that the onsite sleep study be scheduled. (Doc. 148, ¶ 41). On July 30, 2020, Zepeda filed an Offender's Grievance regarding his request for a CPAP machine and sleep study. (*Id.* at ¶ 42). On August 24, 2020, the Grievance Officer provided a response, including a statement from the HCUA Cunningham reading, "August 13-2020 Re: Offender Zepeda Y30997 Review of medical chart. Sleep studies are on hold due to the COVID 19 Pandemic and IDOC Administrative Quarantine. Offender will be notified when sleep study resumes." (*Id.*). At her deposition, Cunningham testified that in response to the grievance, she pulled Zepeda's chart, reviewed it, and after noticing the need for a follow-up, she sent a reminder to scheduling. (Doc. 150, ¶ 41). She sent an email dated August 20, 2020, requesting Zepeda be placed on the provider line to see NP Luking regarding a CPAP, because the request for the sleep study had not been followed up on. (*Id.* at ¶ 42; Doc. 156, ¶ 37). Cunningham further testified that she did not recall the specific policy from the IDOC or Office of Health Services ("OHS") regarding sleep studies, but she would not have written that they were on hold absent express direction from OHS or the Wardens. (Doc. 148, ¶ 43). She also testified that due to the increase in the inmates housed at the infirmary during the Covid-19 pandemic, infirmary placement was based on emergency; a sleep study would not have been deemed an emergency at that time. (*Id.*).[6]

[6] Zepeda disputes this allegation and points to excerpts from Cunningham's Deposition. He indicates that Cunningham's deposition is attached as Exhibit 3 to his response, but that exhibit corresponds to Pittman's deposition. Cunningham's deposition does not appear to be attached to Zepeda's response to the motions. (*See* Doc. 148, p. 13; Docs. 147 & 149). However, Cunningham's deposition is attached as Exhibit 3 to her motion for summary judgment (Doc. 126-3), and the Court has confirmed the accuracy of the cited excerpt in Zepeda's response by reference to it.

On August 21, 2020, Zepeda met with HCUA Cunningham and the ADA Coordinator regarding his hearing loss and accommodations, and she did not document any complaints of sleep apnea. (Doc. 148, ¶ 44). On August 27, 2020, NP Luking noted that she could not see Zepeda due to time constraints and ordered that he be rescheduled. (*Id.* at ¶ 45).

On September 1, 2020, Zepeda saw Dr. Shah complaining of difficulty swallowing for six months and swelling in his neck for two months. (*Id.* at ¶ 46). Dr. Shah ordered an x-ray of his neck and blood work to follow up on abnormal results from prior blood work. (*Id.*). Dr. Shah did not document any complaints of sleep apnea, but again Zepeda argues that he requested a CPAP machine at every visit with a medical provider. (*Id.*). The September 4, 2020, neck x-ray was normal. (*Id.* at ¶ 47). On September 11, 2020, Dr. Shah saw Zepeda at the HCC. He ordered a chest x-ray, EKG, and prescribed Tylenol but did not document any self-reported complaints of sleep apnea. (*Id.* at ¶ 48) The September 15, 2020, chest x-ray showed haziness suggestive of changes related to CHF, and a follow-up study was suggested. (*Id.* at ¶ 49).

On October 5, 2020, NP Luking saw Zepeda with complaints of throat pain and a feeling of fullness. (Doc. 148, ¶ 50). NP Luking noted that the ENT referral had been scheduled, and she provided Zepeda with laxatives at his request. (*Id.*). NP Luking did not document any self-reported complaints of sleep apnea or trouble sleeping. (*Id.*). On October 28, 2020, Zepeda went offsite to see the ENT, and he self-reported sleep apnea. (*Id.* at ¶ 51). The ENT diagnosed Zepeda with mild to moderate SNHL (sensorineural hearing loss), TMJ, and GERD. (*Id.*). On October 29, 2020, NP Stover ordered the recommended medications and referred Zepeda to audiology for hearing aids. NP Stover did not document any complaints of sleep apnea or trouble sleeping. (*Id.* at ¶ 52). The referral for the hearing aid fitting was approved on November 3, 2020. (*Id.* at ¶ 53).

Between December 5, 2020, and December 20, 2020, Zepeda was on a Covid-19 quarantine. (Doc. 150, ¶ 44). On December 31, 2020, NP Luking performed a chart review and prescribed T-gel shampoo for Zepeda's complaints of dandruff. (Doc. 148, ¶ 54). On January 18, 2021, Dr. Shah gave a nurse a telephone order to give Zepeda Clonidine due to his high blood pressure reading and increased Zepeda's Clonidine dosage for one year. (*Id.* at ¶ 55). Later that day, Dr. Shah saw Zepeda for increased blood pressure and a rash. (*Id.*). Dr. Shah prescribed Hydrocortisone cream, an oral antihistamine, and instructed Zepeda to increase his water intake. (*Id.*). He did not document any complaints of sleep apnea or trouble sleeping. (*Id.*).

On March 2, 2021, Zepeda went to the Health Care Unit for his sleep study. (*Id.* at ¶ 56). The nurse explained how the sleep study would work and applied the machine to Zepeda. (*Id.*). The ARES Sleep Study Report was completed by non-party Chandra Matadeen- Ali, M.D., who determined that the findings were consistent with mild, non-positional obstructive sleep apnea (OSA). (*Id.* at ¶ 57). Dr. Matadeen-Ali recommended CPAP settings. (*Id.*).

On April 6, 2021, NP Stover noted that she was unable to see Zepeda in the HCC due to confusion about where Zepeda was to be seen, and he was to be rescheduled. (*Id.* at ¶ 58). On April 13, 2021, NP Stover noted that she was unable to see Zepeda in the HCC due to no movement per security, and he was to be rescheduled. (*Id.* at ¶ 59). On April 15, 2021, NP Luking saw Zepeda in the HCC with complaints of daily headaches. (Doc. 148, ¶ 60). They reviewed Zepeda's sleep study results. (*Id.*). NP Luking prescribed Tylenol and Ibuprofen and placed a referral for a CPAP machine. (*Id.*). Additionally, NP Luking authored a progress note documenting that she discussed Zepeda's plan of care with Dr. Williams. (*Id.*). She noted that they reviewed his current medications and comorbidities. (*Id.*). They decided to follow up with Zepeda via the clinic and

regular follow-ups. (*Id.*). NP Luking increased Zepeda's Clonidine prescription and also provided him with waist-chain and low-bunk permits for one year. (*Id.*). She further noted that she had completed a CPAP referral, adding: "Be sure CPAP referral gets done." (Doc. 147, ¶ 27). The referral order noted: "ASAP please! (Need To Get B/P under control) . . . CPAP as suggested by sleep study done 3/2/2021. I/m had been dx & hx with CPAP before incarceration. I/M has uncontrolled HTN. I/M reports that CPAP helped B/P tremendously. Also has a BMI of 43. Hx. Of CHF as well…" (*Id.* at ¶ 28). The CPAP referral was approved on April 22, 2021. (*Id.* at ¶ 61).

On June 23, 2021, Zepeda was provided with a CPAP machine, CPAP mask and headgear, carrying bag, and one gallon of distilled water. (*Id.* at ¶ 62). He was also provided a permit for the CPAP and equipment. (*Id.*). In the nearly three years between the intake interview and receiving a CPAP machine, Zepeda testified he was not having full sleep cycles at night. (Doc. 147, ¶ 4). His cellmates noticed Zepeda stop breathing and shake violently in his sleep, which interrupted their sleep. (*Id.*). He was waking up in fear of dying, experiencing constant headaches, and had blood pooling in his eye. (*Id.*). After receiving the CPAP machine, Zepeda no longer experienced these nighttime symptoms. (*Id.* at ¶ 6).

Dr. Pittman testified that she disagreed with the quality of care Zepeda received from Defendants Luking and Shah in that Zepeda should have been evaluated for sleep apnea sooner. (Doc. 147, ¶¶ 7, 14-15). Pittman testified that there is a correlation between high blood pressure and sleep apnea. (*Id.* at ¶ 8). She testified that if she had seen Zepeda more frequently and seen the notes on his high blood pressure, Dr. Pittman would have ordered him a sleep study sooner because the consequences of not treating sleep apnea include worsening blood pressure, heart failure, and death. (*Id.* at ¶¶ 9-10). It is Pittman's opinion that Zepeda's obesity and BMI of 43 contributed to

his sleep apnea, and that his body weight and hypertension should have caused immediate concern and more urgency for a sleep study or sleep apnea evaluation. *Id.* at ¶¶ 11-13). According to Pittman, a provider could have requested a sleep study for Zepeda as early as August 2018, after his intake interview at Lawrence. (Doc. 147, ¶ 13).

According to Dr. Shah, sleep apnea can worsen other cardiac and respiratory conditions. (Doc. 147, ¶ 25). He testified that the amount of time it took for Zepeda to receive his CPAP machine was not what normally would have taken for other patients. (*Id.* at ¶ 23). He added that because there was an order for Zepeda to have a sleep study, "probably, somebody should have checked more frequently" to follow up. (*Id*. at ¶ 24; Doc. 162, ¶ 24).

As to Cunningham, Zepeda argues that she was aware of his sleep apnea and his need for a CPAP machine, but she did nothing to facilitate the care he needed. (Doc. 156, ¶¶ 22-23). Zepeda testified that he saw Cunningham approximately seven times during his time at Lawrence and spoke with her about his sleep apnea. (Doc. 150, ¶ 14; Doc. 156, ¶ 25). He informed Cunningham that he had been requesting a CPAP machine and asked for updates on whether he would receive one. (Doc. 150, ¶ 15). He does not know what, if any, actions Cunningham took after speaking with him each time. (*Id.* at ¶ 16). Zepeda also testified that he sent request slips regarding his sleep apnea. The request slips were originally addressed to "health care," but once he learned Cunningham's name, he began addressing them directly to her. (*Id.* at ¶ 9). He did not recall how many request slips he addressed specifically to Cunningham, but she confirmed receiving some when he asked her. (*Id.* at ¶¶ 12-13; Doc. 156, ¶24). Zepeda's wife also called Cunningham multiple times and informed her that Zepeda needed a CPAP machine. (Doc. 156, ¶ 23).

According to Cunningham, inmates may submit request slips to a nurse, through the facility mail, explaining their concerns about their medical care. The nurse logs the request slips, triages them, and puts the individual on the MD line, nurse practitioner line, or the nurse sick call line. (Doc. 150, ¶ 8). If a request slip is specifically addressed to Cunningham, the nurse sorts the request slip out and places it in Cunningham's mailbox. (Doc. 150, ¶ 10). If Cunningham receives such a request, she gets the individual's medical chart, reviews the allegations in connection with the chart, and if there is a disconnect, forwards the request to Wexford or asks that the individual be placed on a provider line by the scheduler at the facility. (Doc. 150, ¶ 11).

In her capacity as the HUCA, Cunningham gathers information for contract monitoring reports, acts as a communication bridge between the IDOC and Wexford Health Services, responds to grievances, and serves as the ADA Coordinator. (Doc. 150, ¶ 4). She meets with the physicians and the providers daily to discuss the plan of action for the day, to address any barriers to care, and to consider options to improve "working with the operations side." (Doc. 156, ¶ 19). She is not, however, responsible for placement decisions; she does not provide direct patient care to inmates, and she did not specifically provide any medical treatment to Zepeda. (Doc. 150, ¶¶ 5, 22-23). Cunningham argues that she does not oversee the medical provider's recommended course of treatment, but Zepeda disputes this allegation, pointing to her responsibility to "monitor staff functions to ensure that patient care and services comply with medical, professional, Nurse Practice Acts, departmental directives and facility policies and procedures," as well as to organize and coordinate patient care assignments. (*Id.* at ¶ 24).

When an inmate must visit an external health care facility, Cunningham reviews the paper regarding the appointment set by Wexford for external care and signs a form, which is provided to

the Warden, and placed in the inmate's chart. (Doc. 150, ¶ 21). The individual responsible for scheduling a sleep study at relevant times at Lawrence was Andrea Holscher, a non-party Wexford employee. (*Id.* at ¶ 29). Cunningham cannot prescribe a medical device to an inmate or expedite an order for medical equipment, but she oversees delays in receiving medical equipment. (Doc. 150, ¶¶ 26-27; Doc. 156, ¶ 20). If there is an alleged delay in a CPAP machine, she follows up with the person at Lawrence who ordered the medical equipment through Wexford. (*Id.* at ¶ 28).

Per her work with contract monitoring, if there is a complaint, medical concern, or correspondence about a lack of communication, Cunningham reviews the inmate's chart and, if appropriate, brings it to Wexford's attention. (*Id.* at ¶ 29). If an inmate stops her on the walk or sends her a letter, she provides that communication to the contracted health care providers at Lawrence. (Doc. 105, ¶ 33). She does not personally follow up with the inmates to let them know she has forwarded communications or concerns on due to time constraints and her expectation that medical staff would follow up with them. (*Id.* at ¶ 34).

As to the specific case, Cunningham testified that the about a year and a half delay between the first note for the need of a sleep study and the actual referral by Pittman, and the two and a half years until the sleep study were "concerning." (Doc. 156, ¶¶ 31, 38, 40). She added that the sleep study should have occurred sooner, that it "probably should have been done" at Zepeda's previous facility, and that "it looked like a delay in scheduling." (Doc. 156, ¶¶ 31, 39, 41). She further explained that delays involving medical devices would be a topic of discussion for the Continuous Quality Improvement ("CQI") team, which included Cunningham, Andrea Holscher, the medical director and the director of nursing, when those positions were filled, the assistant warden of programs, the regional Wexford administrator, and a representative from IDOC office of health

services." (Doc. 156, ¶¶ 42-44). The CQI team discussed backlogs, including in nurse sick calls, MD lines, and mental health. (*Id.* at ¶¶ 43-45). It also discussed vacancies and short staffing, treatment protocols, and training for the nursing staff. (*Id.*). It further addressed whether the facility was behind in orders given by the providers and the reason for it, and identified other problem areas. (*Id.*). The CQI team also discussed individual patients and their care if there was a delay, a medication error, or a grievance had been deemed meritorious. (*Id.* at ¶ 46). Cunningham did not recall whether Zepeda's medical treatment was ever discussed at a CQI meeting. (*Id.* at ¶ 48).

**Summary Judgment Standard**

Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Est. of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248). In considering a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

**Discussion**

The Eighth Amendment "'does not mandate comfortable prisons,' but neither does it permit inhumane ones." *Brown v. Osmundson*, 38 F.4th 545, 549-50 (7th Cir. 2022) (internal citations omitted). To succeed on a deliberate indifference claim, a plaintiff must "provide evidence, either direct or circumstantial," establishing "an objectively serious medical need," which the defendants knew of but consciously disregarded. *Id.* at 550. Mere negligence, civil objective recklessness, or "medical malpractice do[] not become a constitutional violation merely because the victim is a prisoner." *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 483 (7th Cir. 2022) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). Rather, the defendant must have exhibited conduct that approaches "a total unconcern for the prisoner's welfare in the face of serious risks" and is akin to criminal recklessness. *Brown*, 38 F.4th at 550; *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013).

The Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Further, "[d]isagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.* Deliberate indifference implies that a defendant's medical decision was "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 395, 396 (7th Cir. 2006); *Plummer v. Wexford Health Sources, Inc.*, 609 Fed. Appx. 861, 2015 WL 4461297, *2 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no

evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"); *See Berry v. Lutsey*, 780 F. App'x 365, 369 (7th Cir. 2019) (exercise of medical judgment as to the duration for reevaluation of an inmate's scoliosis, after full evaluation of the inmate's condition, was an exercise of medical judgment that negated claim of deliberate indifference). Inmates cannot "demand specific care" or "the best care possible." *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011).

Yet, "receipt of some medical care does not automatically defeat a claim of deliberate indifference" and persistence "in a course of treatment known to be ineffective" may support a finding of reckless disregard of an inmate's serious medical condition. *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007); *Machicote v. Roethlisberger*, 969 F.3d 822, 828 (7th Cir. 2020) (citation omitted). "Deliberate indifference may occur where a prison official, having knowledge of a significant risk to inmate health or safety, administers 'blatantly inappropriate' medical treatment, acts in a manner contrary to the recommendation of specialists, or delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering." *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (internal citation omitted). Further, a provider's "[f]ailure to provide necessary relief and delaying access to a qualified specialist can lead to prolongation of pain" and support a deliberate indifference claim. *Thomas v. Martija*, 991 F.3d 763, 771 (7th Cir. 2021) (citing *Goodloe v. Sood*, 947 F.3d 1026, 1032 (7th Cir. 2020); *Petties v. Carter*, 836 F.3d 722, 730-32 (7th Cir. 2016); *Conley v. Birch*, 796 F.3d 742, 749 (7th Cir. 2015)). Yet, a mere delay in treatment is insufficient to show deliberate indifference. *Id.* at 769. Rather, the Court should look on "how serious the condition in question was, how easy it would have been to treat it, and whether it exacerbated an injury or unnecessarily prolonged pain." *Id.* (quoting

*Petties*, 836 F.3d at 730–31). "Delay need not be extreme; failing to provide a very easy treatment or accommodation can suffice, if unnecessary suffering resulted." *Id.* (citing *Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004)).

Here, Defendants do not dispute that Zepeda's sleep apnea was an objectively serious medical need but argue they were not deliberately indifferent to it. The Court will address each Defendant in turn.

Dr. Shah

Dr. Shah argues that he is entitled to summary judgment because he provided care to Zepeda on limited dates due to the as-needed nature of his medical care at Lawrence, he did not have full access to Zepeda's electronic medical record, and he otherwise adequately addressed Zepeda's concerns. However, based on the record before the Court, a reasonable jury could reach the opposite conclusion.

First, a jury could conclude that Dr. Shah knew of Zepeda's requests for a CPAP machine as early as August 27, 2018. Zepeda testified that during that first visit, he told Dr. Shah that he suffered from sleep apnea, and he needed a CPAP machine. In response, Dr. Shah suggested that Zepeda's family should send him a CPAP machine. When Zepeda insisted that IDOC should provide the CPAP machine, Dr. Shah dismissed his request, responding: "What did you do so bad that your family won't help you?" While Dr. Shah denies ever making those statements, this is a triable issue relevant to Dr. Shah's knowledge of Zepeda's need for a CPAP machine and to his potential deliberate indifference to that need.

There is also no dispute that Zepeda saw Dr. Shah again on November 27, 2018, for a follow-up for his hypertension and on December 26, 2018, for high blood pressure. Zepeda argues

that he informed Dr. Shah of his need for a CPAP machine on those visits, as he did on every visit with a medical provider. Nothing indicates that Dr. Shah took any measures to treat Zepeda's sleep apnea on November 27, 2018. On December 26, 2018, four months after Dr. Shah first allegedly became aware of Zepeda's sleep apnea, Dr. Shah ordered Zepeda's prior sleep apnea medical records. Yet, on January 18, 2021, three years later, when Dr. Shah saw Zepeda again with increased blood pressure, Dr. Shah did not follow up on Zepeda's prior reports of sleep apnea or his own order for prior medical records. Based on the medical testimony regarding the correlation between sleep apnea and hypertension, a reasonable jury could conclude that Dr. Shah was deliberately indifferent by insisting on conservative treatment for hypertension but failing to inquire about Zepeda's reported sleep apnea and his requests for a CPAP machine.

Dr. Shah points to his limited access to Zepeda's electronically stored medical records due to his limited, "as-needed," employment at Lawrence. However, Zepeda's testimony that he advised Dr. Shah of his need for a CPAP machine at every visit raises a triable issue as to Dr. Shah's culpable state of mind, and precludes the entry of summary judgment on that ground. Dr. Shah further argues that Zepeda's testimony is inadequate to create a triable issue as to his knowledge of his sleep-apnea complaints because clear medical evidence contradicts it. He points to medical notes that do not show any discussion of sleep apnea and to his own testimony that, if there had been a discussion of that medical issue, he would have included it in the medical record. This argument also lacks merit. The medical records in this case do not directly contradict Zepeda's allegations. They are simply silent. Rather, it is Dr. Shah's testimony that contradicts Zepeda's allegations. The Court cannot make credibility determinations at this juncture.

Further, Dr. Shah attributes the delay in Zepeda's sleep study to the Covid-19 pandemic and the IDOC policies restricting the use of a CPAP machine in the facility. Still, those policies do not explain why Dr. Shah did not take any action to treat Zepeda's sleep apnea on August 27, 2018, and November 27, 2018, despite Zepeda's hypertension, high body weight, and his continuous requests for a CPAP machine. A reasonable jury could find that Dr. Shah was deliberately indifferent to Zepeda's serious medical need when he inexplicably refused to treat Zepeda's sleep apnea during those first visits.

Accordingly, Zepeda has advanced triable issues that prevent the entry of summary judgment on his deliberate indifference claim against Dr. Shah.

NP Luking

NP Luking likewise argues that she is entitled to summary judgment because she was not deliberately indifferent to Zepeda's sleep apnea and because any delay in his sleep study and approval of CPAP machine were caused by the Covid-19 pandemic policies and resulting delays. As with Dr. Shah, there is adequate record to allow an inference to the contrary.

First, NP Luking appears to argue that she did not become aware of Zepeda's sleep apnea and need for a CPAP machine until June 29, 2020, when Zepeda asked about his sleep study, and she noticed that the sleep study referral form was unchecked. However, as already explained, Zepeda testified that on every visit he had with a medical provider after August 2018, he mentioned his sleep apnea and asked for a CPAP machine. Further, it is undisputed that his intake medical record indicated the need for a follow-up on Zepeda's sleep study within a week. NP Luking first saw Zepeda on October 28, 2019, in the HCC, when she documented that he had a history of sleep apnea. NP Luking did not note ongoing self-reports of sleep apnea and did not take any measure

to treat Zepeda's sleep apnea. She testified that the lack of documented reports of sleep apnea means that they did not discuss it at that encounter. (*Id.*). Yet, through his testimony and the medical notes from his intake interview at Lawrence, Zepeda raised a triable issue as to NP Luking's knowledge of his need for sleep apnea at that time.

NP Luking saw Zepeda again on June 29, 2020, after the IDOC Covid-19 policies were already in place, for an unrelated issue. Zepeda asked about his sleep study, and NP Luking noted that the sleep study referral form was unchecked.[7] On July 20, 2020, Zepeda filed a grievance regarding his need for a CPAP machine, and in response, Cunningham, on August 20, 2020, arranged for Zepeda to be placed on the provider line to see NP Luking regarding a CPAP because the sleep study request had not been followed up on. Yet, on August 27, 2020, NP Luking noted that she could not see Zepeda due to time constraints and ordered that he be rescheduled.

NP Luking saw Zepeda again more than a month later, on October 5, 2020, for complaints of throat pain and a feeling of fullness; she did not document any complaints of sleep apnea and did not take any steps to follow up on Zepeda's sleep study despite Cunningham's instruction for a follow-up. (*Id.*). Zepeda finally had his sleep study on March 2, 2021. One and a half months later, on April 15, 2021, NP Luking reviewed the results of Zepeda's sleep study and placed an urgent order for a CPAP machine to address his uncontrolled hypertension.

---

[7] In the argument section of NP Luking's Memorandum of Law in Support of Motion for Summary Judgment, NP Luking points to her deposition for the proposition that "on June 29, 2020, she would have made the scheduler aware of the approved referral for the sleep study once she learned that it had not been processed." (Doc. 124, p. 18). However, this allegation was not included in the parties' Statements of Material Facts or Statement of Additional Material Facts. Accordingly, pursuant to Local Rule 56.1, the Court does not consider it.

This record allows an inference that NP Luking failed to take measures to address Zepeda's sleep apnea from October 28, 2019, when she first met with Zepeda at the HCC and recorded a history of sleep apnea, until April 15, 2021, when she ordered the CPAP machine. A reasonable jury could find that this 17-month delay to treat Zepeda's sleep apnea shows that she was deliberately indifferent to his serious medical need. *See Petties*, 836 F.3d at 730 (noting that an "inexplicable delay in treatment which serves no penological interest" can be the basis of a deliberate indifference to serious medical need claim); *Thomas*, 991 F.3d at 771 (finding that a six-month delayed response to an inmate's requests for low-bunk permit and a ten-month delayed referral to an orthopedic specialist without any explanation for the inaction allowed an inference that the doctor "consciously and needlessly delayed both measures").

NP Luking attributes the delay in Zepeda's sleep study to COVID-19 policies and delays. She argues that the increased medical emergencies resulting from the pandemic and the IDOC restrictions on the use of CPAP machines rendered the scheduling of a sleep study a lower priority issue. However, the record is conflicting as to the scale of the IDOC restrictions on the use of a CPAP machine during the COVID-19 pandemic. While the cited IDOC policies restricted the use of CPAP machines to some extent, there is no indication that they placed sleep studies on hold. Moreover, on August 20, 2020, in response to Zepeda's grievance, Cunningham requested that Zepeda be placed on the provider line to see NP Luking regarding a CPAP, because the request for the sleep study had not been followed up on. This raises the question of why Cunningham ordered NP Luking to see Zepeda and follow up on his sleep study at that time if sleep studies were on hold due to the Covid-19 pandemic or Zepeda would not be allowed to use the CPAP machine under the IDOC policies.

NP Luking further relies on *Mack v. Osmundson* to argue that she should not be found deliberately indifferent for exercising her professional judgment not to prioritize Zepeda's sleep study, which she considered a non-emergency during the Covid-19 pandemic. No. 1:21-CV-1247-SLD, 2024 WL 1261881, at *13 (C.D. Ill. Mar. 25, 2024), *aff'd*, No. 24-1556, 2024 WL 5182627 (7th Cir. Dec. 20, 2024). NP Luking's reliance on *Mack* is misplaced. There, the inmate argued that a nurse practitioner refused to address his respiratory issues at an appointment scheduled to be a follow-up for unrelated test results. *Id.* The court found that a "deferral of treatment for 'the inmate's' non-emergency complaints regarding respiratory issues or sleep apnea at an appointment scheduled to address other concerns [did] not show deliberate indifference." *Id.* (citing *Rankin v. Baker*, 770 F. App'x 752, 754 (7th Cir. 2019)). Here, however, evidence shows a delay of approximately 17 months during which NP Luking was aware of Zepeda's sleep apnea and still failed to take any action. Notably, in August 2020, when Cunningham intervened to have Zepeda see NP Luking for a follow-up on the sleep study referral, NP Luking canceled that appointment. It is possible that a reasonable jury could side with NP Luking and conclude that the Covid-19 pandemic justified the delay in Zepeda's sleep study. However, this remains a triable issue for the jury to resolve. Accordingly, NP Luking is not entitled to summary judgment.

<u>HCUA Cunningham</u>

Defendant Cunningham argues she is entitled to summary judgment because she was not personally involved in the alleged constitutional violation, she reasonably relied on the orders of the treating medical providers, and Zepeda has not established through verifying medical evidence that he suffered an injury from the alleged delay in receiving a CPAP machine. She further argues she is entitled to qualified immunity. The Court addresses each argument in turn.

*1. Personal Involvement*

A defendant will not be liable under section 1983 unless personally involved in the underlying constitutional violation. *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018) (citing *Wilson v. Warren Cnty.*, 830 F.3d 464, 469 (7th Cir. 2016)). A defendant with supervisory authority may be found personally involved in the constitutional violation if she "know[s] about the conduct and facilitate[s] it, approve[s] it, condone[s] it, or turn[s] a blind eye . . . ." *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012).

For instance, in *Minix v. Canarecci*, the Seventh Circuit found that a jail's medical director was not liable under § 1983 when there was no evidence that he knew that any nurse "was performing incompetent assessments of suicidal inmates but nevertheless acquiesced in that practice." 597 F.3d 824, 834 (7th Cir. 2010). Likewise in *Mitchell v. Kallas*, the Seventh Circuit affirmed summary judgment in favor of a prison psychologist when there was no evidence that he "could have sped up [the doctor's] evaluation or the Committee's deliberations [about hormone therapy], or could have influenced the Committee's final decision," or that he had authority to order hormone therapy. 895 F.3d 492, 499 (7th Cir. 2018). On the other hand, in *Woodward v. Corr. Med. Servs. of Illinois, Inc.*, the Seventh Circuit affirmed the award of punitive damages against the company that provided health care services to the jail, where the company "was on notice that its employees ignored the medical needs of inmates and that such a practice could result in an inmate successfully committing suicide" and nonetheless condoned of its employees' "routine disregard for policies and procedures." 368 F.3d 917, 930 (7th Cir. 2004).

Here, the record allows a reasonable inference that Cunningham was personally involved in the alleged constitutional violation. First, based on Zepeda's testimony, Cunningham was aware

of the delays in his sleep study: Zepeda sent her multiple request slips; he talked to her about those requests and the delays in the sleep study approximately seven times; and Zepeda's wife also made multiple calls to Cunningham regarding the same matter. While it is unclear when Zepeda first advised Cunningham of his need for a CPAP machine and the delays in his sleep study, there is no dispute that Cunningham became aware of those complaints on August 20, 2020, when she responded to his grievance. It is true that Cunningham's mere response to Zepeda's grievance is insufficient to establish a claim for deliberate indifference. *See Owens v. Evans*, 878 F.3d 559, 562 (7th Cir. 2017) (explaining that the review or denial of a grievance does not establish personal involvement in a constitutional violation). Yet, the record here allows an inference that Cunningham was otherwise personally involved in Zepeda's referral for a sleep study or at least turned a blind eye to the delay despite being aware of it.

Specifically, Cunningham confirmed that part of her job entailed investigating delays in obtaining medical equipment, like a CPAP machine, by reviewing the inmate's chart to confirm the need and then raising the issue with Wexford. She testified that after reviewing Zepeda's grievance, she pulled his chart, reviewed it, and after noticing the need for a follow-up, she sent an email dated August 20, 2020, requesting Zepeda be placed on the provider line to see NP Luking regarding a CPAP, because the request for the sleep study had not been followed up on. Even though those actions appear to have been triggered by Zepeda's grievance, they go beyond the mere review and response to it and show Cunningham's active involvement in Zepeda's request for a sleep study and a CPAP machine. Of course, those actions do not show deliberate indifference on her behalf. However, the subsequent additional eight-month delay until the scheduling of Zepeda's sleep study, coupled with Zepeda's testimony of ongoing communications with

Cunningham regarding his need for a CPAP machine, raises factual questions and allows an inference that Cunningham turned a blind eye to the scheduling delay.

Cunningham contends that the additional scheduling delay was due to the IDOC Covid-19 policies. Yet, while those policies restricted the use of CPAP machines, there is no indication that they placed sleep studies on hold. Notably, while Cunningham's response to Zepeda's grievance stated that sleep studies were on hold, her contemporaneous email request that Zepeda be placed on the provider line to see NP Luking regarding a CPAP, because the request for the sleep study had not been followed up on, raises questions as to the accuracy of that statement. Accordingly, there is ample evidence supporting an inference that Cunningham was personally involved in the inexplicably delayed treatment of Zepeda's sleep apnea.

*2. Reasonable Reliance on Treating Medical Providers*

It is well established that non-medical prison officials will not be held liable for deliberate indifference to an inmate's serious medical need when they reasonably rely on the care of medical experts. *Johnson v. Doughty*, 433 F.3d 1001, 1010-12 (7th Cir. 2006). Yet, if prison administrative officials have "reason to know that their medical staff [are] failing to treat or inadequately treating an inmate, liability is possible." *Miranda v. Cnty. of Lake*, 900 F.3d 335, 343 (7th Cir. 2018) (citing *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012)).

Here, Cunningham argues that she is entitled to summary judgment because she did not personally treat Zepeda, she is not responsible for performing or conducting sleep studies, and cannot prescribe medical devices. She argues she reasonably relied on the medical personnel who treated Zepeda for his high blood pressure. This argument lacks merit. No evidence shows that any of the providers who treated Zepeda recommended delaying the sleep study for medical reasons.

In fact, Cunningham testified that scheduling delays likely prevented the sleep study from being performed in a timely manner and that the sleep study should have occurred sooner, even at Zepeda's previous facility. There is further evidence that the scheduling delays and delays in care fell within her purview as a HCUA, responsible for monitoring staff functions to ensure that patient care and services complied with medical and professional standards, and as a member of the CQI team, which discussed treatment delays, backlogs, and problem areas in individual patients and their care. At a minimum, the record allows an inference that Cunningham had reasons to know that the medical treatment that Zepeda received for his sleep apnea at Lawrence was inadequate due to the "concerning" and lengthy scheduling delays and failed to take steps to address it.

*3. Verifiable Medical Evidence of Harm*

A plaintiff who claims a delay in medical care, as opposed to a total denial of treatment, must present "verifying medical evidence" that the delay caused harm. *Walker v. Wexford Health Sources, Inc.,* 940 F.3d 954, 964 (7th Cir. 2019). Besides expert testimony, a plaintiff may establish causation through medical records, treatment notes, or physician notes that confirm or corroborate a claim of detrimental delay. *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007).

Here, Cunningham argues that Zepeda has not offered verifiable medical evidence showing that the delay in the sleep study and the CPAP machine caused him any harm. She relies on *Black v. Dearmond*, where the court granted summary judgment because the inmate had failed to offer verifiable medical evidence that he was harmed by the delay in receiving a CPAP machine. No. 21-CV-1118-DWD, 2025 WL 370888, at *7 (S.D. Ill. Feb. 3, 2025). However, Zepeda's medical records show that from August 2018 through June 2021, when he finally received the CPAP machine, he suffered from high blood pressure that required multiple adjustments to his

medication. Dr. Pittman testified that the consequences of not treating sleep apnea include worsening blood pressure and noted that Zepeda's body weight and hypertension should have caused immediate concern and more urgency for a sleep study or sleep apnea evaluation. Importantly, on April 15, 2021, when Defendant Luking ordered the CPAP machine, she noted: "ASAP please! (Need To Get B/P under control) . . . I/M has uncontrolled HTN." This is sufficient to establish a proximate cause between Zepeda's high blood pressure from August 2018 to June 2021 and the lack of a CPAP machine for his sleep apnea.

*4. Qualified Immunity*

Cunningham also moved for summary judgment based on qualified immunity. Generally, government officials are protected from civil liability when performing discretionary functions under the doctrine of qualified immunity so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982); *see also Alvarado v. Litscher*, 267 F.3d 648, 652 (7th Cir. 2001). To evaluate a claim of qualified immunity, courts engage in a two-part inquiry. The first question is whether the defendant's conduct violated a constitutional right. *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013) (citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)). The second question is whether that particular constitutional right was "clearly established" at the time of the alleged violation. *Id.* The two questions may be considered in any order. *Volkman*, 736 F.3d at 1090 (citing *Pearson*, 555 U.S. at 236-42). "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is

doing violates that right[.]'" *Estate of Escobedo v. Bender,* 600 F.3d 770, 779 (7th Cir. 2010), quoting *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002).

Here, the question is whether a reasonable official would understand that she violated Zepeda's rights by disregarding his need for a CPAP machine despite knowing of the scheduling delays in his sleep study. The Seventh Circuit has found that an "inexplicable delay in treatment which serves no penological interest" can be the basis of a deliberate indifference to serious medical need claim. *See Petties*, 836 F.3d at 730 (collecting relevant case law). Further, a prison administrative official can be held liable for deliberate indifference to a serious medical need if she "ha[d] a reason to believe (or actual knowledge)" that the medical staff was "mistreating (or not treating)" a prisoner. *See McGee v. Parsano*, 55 F.4th 563, 574 (7th Cir. 2022) (citing *King*, 680 F.3d at 1018). Here, as already discussed, there is evidence from which a reasonable jury could conclude that Cunningham was aware of "concerning" and "lengthy" scheduling delays in the sleep study and of Zepeda's need for a CPAP machine, yet failed to address those delays despite her authority to do so as a HCUA and member of the CQI team. Accordingly, Cunningham is not entitled to summary judgment on qualified immunity grounds.

## Conclusion

For the reasons set forth above, the Motion to Substitute (Doc. 162) is **GRANTED**, and Defendants' Motions for Summary Judgment (Docs. 123 & 126) are **DENIED**.

**IT IS SO ORDERED.**

**DATED: August 24, 2026**

**Hon. Reona J. Daly**
**United States Magistrate Judge**